Karen L. KEELE, on behalf of herself and all others similarly situated, Plaintiff–Appellee,

v.

Norman Paul WEXLER, Mitchell Wexler and Wexler and Wexler, Defendants–Appellants.

No. 97–2799.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 10, 1998.

Decided July 6, 1998.

O. Randolph Bragg, Horwitz, Horwitz & Associates, Chicago, IL; Daniel A. Edelman, Adam B. Goodman (argued), Edelman & Combs, Chicago, IL, for Karen L. Keele.

Michael P. Connelly, Mary Lisa Sullivan Kamins, Connelly & Schroeder, Chicago, IL; Daniel F. Konicek (argued), Connelly & Schroder, Geneva, IL, for Norman P. Wexler.

Michael P. Connelly, Mary Lisa Sullivan Kamins, Connelly & Schroeder, Chicago, IL;

Daniel F. Konicek, Connelly & Schroder, Geneva, IL, for Wexler and Wexler.

Before CUMMINGS, COFFEY and MANION, Circuit Judges.

COFFEY, Circuit Judge.

The defendants-appellants, Norman Wexler and Wexler & Wexler (collectively, "the Wexlers"), appeal from the order of the district court granting class certification to the plaintiff-appellee, Karen Keele, in an action arising out of the Wexlers' debt collection practices, allegedly violative of the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, and the Colorado Fair Debt Collection Practices Act ("CFDCPA"), Colo.Rev.Stat. § 12–14–101 *et seq.* More specifically, they claim that Keele did not suffer the same injury as the class members she seeks to represent and, in the alternative, that certain transactions at issue herein were "non-consensual," and thus not covered by the FDCPA. We affirm.

## I. BACKGROUND

On July 30, 1994, Keele, a Colorado resident, wrote a $85.26 personal check to a Wal–Mart discount store in Littleton, Colorado, as payment for her purchases. Her bank subsequently declined to honor the check for want of sufficient funds. Wal–Mart retained the Wexler & Wexler law firm of Chicago, Illinois, to contact Keele and seek collection of the alleged $85.26 in outstanding debt.

Acting on behalf of Wal–Mart, Wexler & Wexler sent Keele several threatening "debt collection" letters in late 1994. The first of these correspondences, dated November 2, 1994, informed Keele that she would have to pay $117.76—the sum of the $85.26 dishonored check, a $20.00 service charge, and a $12.50 collection fee—"at once" in order to avoid being sued by Wal–Mart. It read further, in pertinent part:

> Your conduct to date has been outrageous. Not only have you unlawfully caused our client to be damaged by passing a worthless check(s), but you have also refused and still persist in your refusal to make restitution.

YOU ARE ABOUT TO BE TREATED IN A MANNER THAT WILL CAUSE YOU TO THINK TWICE BEFORE YOU WRITE ANOTHER WORTHLESS CHECK. OUR CLIENT HAS INSTRUCTED THAT WE NOTIFY YOU THAT YOU ARE GOING TO BE SUED UNLESS REPAYMENT IS FORTHCOMING AT ONCE....

Wexler & Wexler's second letter, sent approximately one month later, December 1, 1994, was even more scathing. Keele was notified that she had only five days in which to remit payment of the $117.76; if she failed to do so, legal action would be taken against her forthwith. "You have exhausted our patience and we do not intend to be put off any longer," Wexler & Wexler wrote. The letter went on to warn her:

### THIS IS A FIVE DAY NOTICE

Unless payment in full is made to this office at once or suitable substitute arrangements are agreed upon, we intend to place this matter in the hands of a local attorney's office. Furthermore, we will instruct them to:

> 1. Notify all local credit reporting agencies that you are a hopelessly delinquent debtor so that others may be protected from dealing with you.

\* \* \*

> You must act at once while this matter is still in our hands; once we institute these proceedings, you will be required to pay all of the costs and fees involved with litigation. This letter is an attempt to collect a debt and any information obtained may be used for that purpose.

Wexler & Wexler's threats apparently were effective. Keele promptly sent a check to the firm in the amount of $105.26—the $117.76 demanded less the $12.50 "collection fee."

On June 13, 1995, Keele filed a class action complaint against Norman Wexler, Mitchell Wexler and Wexler & Wexler, on behalf of all Colorado residents who received debt collection letters like the ones she was sent on

November 2 and December 1, 1994.[1] She alleged that the threatening and abusive language contained within these correspondences violated various provisions of the FDCPA, 15 U.S.C. § 1692 *et seq.*, and the CFDCPA, Colo.Rev.Stat. § 12–14–101 *et seq.* Keele also claimed that Colo.Rev.Stat. § 13–21–109 prohibited Wexler & Wexler from seeking the $12.50 "collection fee" from Wal–Mart debtors residing in Colorado.[2] The complaint requested statutory damages as provided for under § 1692k of the FDCPA, as well as actual damages, attorney's fees, litigation expenses and costs.

On July 19, 1995, Keele filed a motion for class certification. Then, in August of 1995, Mitchell Wexler moved for, and was granted, summary judgment.[3] This left only two defendants remaining in the action, Norman Wexler and his law firm, Wexler & Wexler. The district court eventually issued an order on March 18, 1996, granting Keele's motion to certify the class consisting "of all Colorado residents who have received collection letters from defendants within the relevant time period."[4] Several months later, the parties agreed to the entry of a consent decree and final judgment in the case. The defendants, while denying any liability of wrongdoing, changed the language of their debt collection letters. They also expressly retained the right to appeal the court's order granting class certification. The trial judge awarded Keele $1,000 in statutory damages, the Colorado Legal Aid Foundation $4,000 in statutory damages as a *cy pres* remedy for the settlement class, $14,250 of actual damages to the class, and $17,500 to Keele's attorneys for fees and costs.

## II. ISSUES

The defendants-appellants advance three issues for our review. Initially, they contend that Keele, who did not pay the $12.50 collection fee, does not have standing to represent a class of persons seeking actual damages under the FDCPA arising out of their (the defendants') alleged illicit demand for such collection fees. For the same reason, the Wexlers claim that Keele does not satisfy the "commonality" and "typicality" requirements for class certification under Fed.R.Civ.P. 23. And lastly, the appellants contend that the district court erroneously certified the class because the FDCPA covers only "consensual" transactions, and transactions involving individuals who write checks, knowing they will be dishonored, are by their nature not consensual.

## III. DISCUSSION

The Federal Rules of Civil Procedure provide the federal district courts with "broad discretion" to determine whether certification of a class-action lawsuit is appropriate. *See Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 474 (7th Cir.1997) (citing *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir.1993)). "Our review is 'circumscribed' and we will reverse the grant ... of class certification only for an abuse of discretion." *Id.* We have likened appellants attempting to hurdle this high standard of review to "rich men who wish to enter the Kingdom; their prospects compare with those of camels who wish to pass through the eye of a needle." *United States v. Glecier*, 923 F.2d 496, 503 (7th Cir.), *cert. denied*, 502 U.S. 810, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991) (citing Matthew 19:24).

### A. *Standing*

"To have standing to sue as a class representative it is essential that a plaintiff must be a part of that class, that is, he must possess the same interest and suffer the

---

1. The complaint sought to hold Norman and Mitchell Wexler vicariously liable as principals of Wexler & Wexler.

2. The Colorado legislature allows only persons "licensed as a collection agency pursuant to article 14 of title 12, C.R.S." to impose a charge for collection costs. *See* C.R.S. § 13–21–109. None of the defendants are licensed as such.

3. The district court granted summary judgment in Mitchell Wexler's favor, finding that he was not a partner in Wexler & Wexler and that he had not participated in the allegedly illegal conduct.

4. The class period for violations of the FDCPA begins one year prior to the date of filing suit. The CFDCPA class period runs from two years before the commencement of the action.

same injury shared by all members of the class he represents." *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 216, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974) (citations omitted). Keele purports to represent four classes of individuals, two of which, classes A and B, are comprised of individuals who claim to have been damaged by the Wexlers' demand for the alleged illegal and unauthorized $12.50 collection fee.[5] The defendants' argument on appeal is really quite simple. They contend that, insofar as Keele admits she did not pay the $12.50, her injuries differ from the those sustained by the members of classes A and B. Ergo, she has no standing to represent these individuals in a class-action suit. In reality, however, the issue is not as cut and dry as the Wexlers make it out to be.

■ From a factual standpoint, it is far from clear whether the defendants are correct in asserting that Keele did not pay the collection fee. There is no doubt that Keele sent the Wexlers a payment in the amount of $105.26, equal to the sum total of the $85.26 dishonored check plus Wal–Mart's $20.00 service charge. This $105.26 is all Keele owed Wal–Mart, and she does not contest that figure. She contends, however, that the Wexlers retained $12.50 of her $105.26 payment, and as such, according to Wal–Mart's records, she still owes Wal–Mart $12.50. In other words, Keele argues that every member of class A or B who paid an amount exceeding the value of their dishonored check contributed, albeit unknowingly, to the defendants' illegal collection fee. The district judge felt it unnecessary to decide whether a benefit to the Wexlers was tantamount to actual damage to Keele because the injuries she and the class members alleged were the receipt of the debt collection letters, not the payment of the $12.50 collection fee. We likewise will not consider this question, as it has no bearing upon Keele's standing to represent classes A and B. She, like the members of those classes, received the Wexlers' letters, both purported to be in violation of the FDCPA and CFDCPA. It is thus irrelevant whether or not she paid the collection fee.

As noted above, to satisfy the standing requirement in a class action lawsuit, the class representative must possess the "same interest and suffer the same injury" as the individuals he or she seeks to represent. *See Schlesinger*, 418 U.S. at 216, 94 S.Ct. at 2930. The injury common to classes A and B was the receipt of the Wexlers' collection letters which, as Keele's motion for class certification alleges, "illegally add unauthorized collection fees to the amount claimed and misrepresent that the debtor will owe amounts to which he or she is not legally liable for under the Colorado bad check statute, C.R.S. § 13–21109." The damages recoverable for the class members' injuries may differ—some may be eligible for both actual and statutory damages, others actual damages only, and still others just statutory relief—but the fact remains that their injuries are the same.

■ The FDCPA does not require proof of actual damages as a precursor to the recovery of statutory damages.[6] *See Bartlett v. Heibl*, 128 F.3d 497, 499 (7th Cir.1997) (consumer may recover statutory damages only under FDCPA); *Baker v. G.C. Servs. Corp.*, 677 F.2d 775, 781 (9th Cir.1982) ("[S]tatutory damages are available without proof of actual damages" under the FDCPA.). In other words, the Act is blind when it comes to distinguishing between

---

5. The four classes Keele seeks to represent may be categorized, to wit: classes A and B include all Colorado residents to whom the defendants sent collection letters in the form of the November 2 and December 1, 1994, correspondences to Keele, respectively; class C consists of all Colorado residents to whom the defendants mailed collection letters which threatened suit; and class D is made up of all Colorado residents to whom the defendants sent collection letters generally. The district court, although having ruled that Keele could properly represent all four classes, consolidated the classes into one large class consisting of all Colorado residents who received the Wexlers' collection letters (i.e., the class D definition). For purposes of clarity, we will refer to the classes by their original designations (i.e., A, B, C, and D).

6. Because the CFDCPA "is patterned on the Federal Fair Debt Collection Practices Act," *Commercial Serv. of Perry, Inc. v. Fitzgerald*, 856 P.2d 58, 59 (Colo.App.1993), our legal discussion of the FDCPA is equally applicable to the CFDCPA. The parties do not contend otherwise.

plaintiffs who have suffered actual damages and those who have not. So long as Keele's and the class members' injuries arose out of the same violative conduct, she may properly represent classes A and B. Indeed, the FDCPA is designed to protect consumers from the unscrupulous antics of debt collectors, irrespective of whether a valid debt actually exists. *See Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 341 (7th Cir.1997) (quoting *Baker*, 677 F.2d at 777). Thus, the plaintiff who admittedly owes a legitimate debt has standing to sue if the Act is violated by an unprincipled debt collector. *See Baker*, 677 F.2d at 777 ("*Baker*, even though he stated that he did owe the entire debt, has standing to assert any violations of the Act [FDCPA]."). The common message of *Mace* and *Baker* is clear. We must focus on the debt collector's misconduct, not whether the debt is valid or, as here, whether the consumer has paid an invalid debt (i.e, the $12.50 collection fee). In this case, every member of classes A and B received the Wexlers' letters of November 2 and December 1, 1994, respectively, both of which were alleged to have contained illegal demands for payment of the $12.50 collection fee. Keele also received these correspondences. Notwithstanding her lack of a claim for actual damages, she still has standing to represent classes A and B.

### B. Satisfaction of Rule 23 of the Federal Rules of Civil Procedure

Rule 23 of the Federal Rules of Civil Procedure recites four threshold requirements applicable to all federal-court class actions: (1) numerosity (the class must be so large "that joinder of all members is impracticable"); (2) commonality (there must exist "questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical ... of the class"); and (4) adequacy of representation (the representative must be able to "fairly and adequately protect the interests of the class"). *See Amchem Products, Inc. v. Windsor*, ⎯ U.S. ⎯, ⎯, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689 (1997). The Wexlers urge that neither the second nor third of these prerequisites, commonality and typicality, are met

here because (once again) Keele did not pay the collection fee, whereas members of classes A and B took it upon themselves to remit the $12.50 payment. "[F]ailure to exclude from the class those individuals who paid the $12.50 collection fee," the defendants argue, "would require a case by case determination and ... would make the case unmanageable." Our question for the Wexlers is, what would have to be determined on a case-by-case basis? They fail to tell us, and it is not the business of this court to formulate arguments for the parties. *See Kurzawa v. Jordan*, 146 F.3d 435, 447 (7th Cir. 1998). In any event, we are unable to locate anything in the record suggesting that the district judge somehow abused his discretion by ruling that Keele's claims satisfy the commonality and typicality requirements of Fed. R.Civ.P. 23.

"A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) (citing *Franklin v. City of Chicago*, 102 F.R.D. 944, 949–50 (N.D.Ill.1984)). Common nuclei of fact are typically manifest where, like in the case *sub judice*, the defendants have engaged in standardized conduct towards members of the proposed class by mailing to them allegedly illegal form letters or documents. *See Chandler v. Southwest Jeep–Eagle, Inc.*, 162 F.R.D. 302, 308 (N.D.Ill.1995) (citing cases); *Kleiner v. First Nat'l Bank of Atlanta*, 97 F.R.D. 683, 691 (N.D.Ga.1983) ("When viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action...."); *Heartland Communications, Inc. v. Sprint Corp.*, 161 F.R.D. 111 (D.Kan.1995) (certifying class where contracts signed by all class members contained virtually same provision as that challenged by class representative). The fact that Keele did not pay the collection fee is largely irrelevant; factual variations among class members' grievances do not defeat a class action. *See Patterson v. General Motors Corp.*, 631 F.2d 476, 481 (7th Cir. 1980) (citation omitted). Accordingly, we agree with the trial judge that Keele's claims

present questions of law and fact common to classes A and B.

■ Whether Keele's claims are typical of those of the class members she represents is closely related to the commonality inquiry. *See Rosario*, 963 F.2d at 1018 ("The question of typicality in Rule 23(a)(3) is closely related to the ... question of commonality."). A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983) (citations and internal quotation omitted). Keele's claims fall within this definition. By mailing the form letters seeking the $12.50 collection fee, the Wexlers engaged in the same course of conduct towards Keele and the members of classes A and B. These individuals are now suing the Wexlers under the FDCPA and CFDCPA, alleging violations of the same statutory sections under the same legal theory. We are confident that Keele has met Rule 23's typicality requirement.

■ Lastly, the Wexlers argue that, because the FDCPA reaches only consensual transactions, class certification is improper to the extent that there is no way of knowing which class members who wrote dishonored checks to Wal–Mart engaged in consensual transactions with the merchant. If a customer intended that his or her check would be dishonored, the defendants reason, he or she could not have been party to a consensual transaction. As such, they go on to state, individual questions of fact predominate over any common ones. We disagree.

■ Our point of contention with the defendants' position stems from the same case upon which they rely, *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322 (7th Cir.1997), where we held that "the FDCPA limits its reach to those obligations to pay arising from consensual transactions, where parties negotiate or contract for consumer-related goods or services." *Id.* at 1326 (citations omitted). As a general mat-

ter, obligations arising out of dishonored checks meet these criteria. *See id.* at 1325. Thus, the Wexlers are in effect requesting that this court recognize a judicially-created fraud exception to the FDCPA. We touched upon a similar request in *Bass* without formally deciding the issue, but did express at length "our discomfort with the proposition that the courts should create a fraud exception where none exists in the Act's text." *Id.* at 1329–30. Unfortunately for the Wexlers, this "discomfort" has not subsided since *Bass*, and it is time we put to rest any lingering doubts as to the nonexistence of a fraud exception to the FDCPA.

As we explained in *Bass*, neither the text nor underlying legislative history of the FDCPA lends itself to the recognition of a fraud exception. Indeed, *nothing* in the Act makes inquiry into the debtor's intent at the time he or she writes a subsequently-dishonored check. Its language focuses primarily, if not exclusively, on the conduct of debt collectors, not debtors. Absent some textual directive in the FDCPA, we will not alter that focus, for our task is to interpret the words of Congress, not add to them. *See Wilson v. United States*, 125 F.3d 1087, 1090 (7th Cir.1997) ("It is a well-established principle that [c]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.") (citations and internal quotations omitted); *Morse v. Republican Party of Virginia*, 517 U.S. 186, 276 n. 18, 116 S.Ct. 1186, 1234 n. 18, 134 L.Ed.2d 347 (1996) (Thomas, J., dissenting) ("We are not free to construe statutes by wondering about what Congress 'would have wanted to enact.' There are myriad reasons why measures that 'a Congress' ... might 'wan[t] to enact' never become law. We must look to the extant text of the statute and see what Congress has in fact, and not in theory, enacted."). Moreover, the express purpose of the Act is to forbid debt collectors from harassing, oppressing or abusing "*any person*"—not just "deserving" debtors—in the debt collection process. *See* 15 U.S.C. § 1692d; *see also Bass*, 111 F.3d at 1326.[7]

---

7. Of course, as we explained in *Bass*, 111 F.3d at 1326, some transactions do not result in a debt in the first place, and as such, they are beyond the reach of the FDCPA. *See Shorts v. Palmer*, 155

To this we add that the FDCPA's legislative history reflects that Congress acknowledged there may be a "number of persons who willfully refuse to pay just debts," S.Rep. No. 382, 95th Cong., 1st Sess. 3 (reprinted in 1977 U.S.Code Cong. & Admin. News 1695, 1697) (emphasis added), but apparently "believe[d] that the serious and widespread abuses" of debt collectors outweighed the necessity to carve out an exception for these so-called "deadbeats." *See id.* If the Act was designed to protect those who willfully refuse to pay their debts, it makes little sense why consumers who write checks, knowing they will be dishonored, should not enjoy the same protections.

We see no need to repeat the *Bass* opinion in its entirety. The reasoning in that case stands on its own, as does its conclusion. "Absent an explicit showing that Congress intended a fraud exception to the Act, the wrong occasioned by debtor fraud is more appropriately redressed under the statutory and common law remedies already in place, not by a judicially-created exception that selectively gives a green light to the very abuses proscribed by the Act." *Bass*, 111 F.3d at 1330. Because we hold that there is no fraud exception to the FDCPA, it is irrelevant for purposes of this appeal whether certain members of the classes Keele represents might have intended that their checks would be dishonored.

For these reasons, we hold that the trial judge properly granted class certification to Keele in her class action lawsuit against the Wexlers. The judgment of the district court is affirmed.

AFFIRMED.

F.R.D. 172, 175–76 (S.D.Ohio 1994) (obligation to pay for shoplifted merchandise not a "debt" because "plaintiff has never had a contractual arrangement of any kind with any of the defendants."); *Mabe v. G.C. Servs. Ltd. Partnership*, 32 F.3d 86, 88 (4th Cir.1994) (obligation to pay child support not a "debt" under the FDCPA because it was not incurred in exchange for consumer goods or services).